1  **WO**

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                         DISTRICT OF ARIZONA

8   QUECHAN INDIAN TRIBE OF THE FORT       No.: CV 07-0677-PHX-JAT
    YUMA INDIAN RESERVATION, a federally
9   recognized Indian Tribe,               **FINDINGS OF FACT AND**
                                           **CONCLUSIONS OF LAW**
10                   Plaintiff,

11  v.

12  U.S. DEPARTMENT OF THE INTERIOR, ET
    AL.,
13
                     Defendants.
14

15         On March 30, 2007, the Quechan Indian Tribe of the Fort Yuma Indian Reservation

16  ("Plaintiff") filed a Complaint for Injunctive Relief against numerous federal Defendants[1] and

17  non-federal Defendants.[2]  In the Complaint, Plaintiff alleges that the Bureau of Reclamation

18  ("BOR") violated the National Environmental Policy Act of 1969, 42 U.S.C. § 4332, *et seq.*

19  ("NEPA") and the National Historic Preservation Act, 16 U.S.C. § 470, *et seq.* ("NHPA") by

20

21  ─────────────────

22  [1]The federal Defendants are: (1) U.S. Department of the Interior; (2) Dirk Kempthorne, as
    Secretary of the Interior; (3) U. S. Bureau of Reclamation; (4) Robert W. Johnson, as
23  Commissioner, U.S. Bureau of Reclamation; (5) Larry Walkoviak, as Acting Regional
    Director, Lower Colorado Region, U.S. Bureau of Reclamation; (6) Jayne Harkins, as Acting
24  Regional Director, Lower Colorado Region, U.S. Bureau of Reclamation; and (7) Jim Cherry,
    as Area Manager, Yuma Area Office, U.S. Bureau of Reclamation.
25

26  [2]The non-federal Defendants are: (1) Wellton-Mohawk Irrigation and Drainage District; (2)
    Charles W. Slocum, as Wellton-Mohawk General Manager; (3) Arizona Clean Fuels Yuma,
    LLC; and (4) Glenn McGinnis, as Chief Executive Officer, Arizona Clean Fuels Yuma, LLC.

failing to properly analyze the potential environmental and cultural resources impact resulting from the transfer of federal land to the Wellton-Mohawk Irrigation and Drainage District ("District"). Plaintiff also alleges that BOR violated the Wellton-Mohawk Transfer Act of 2000 by transferring federal land for purposes of developing an oil refinery. Finally, Plaintiff alleges that BOR violated the Administrative Procedures Act, 5 U.S.C. § 706(2)(A) ("APA"), by engaging in actions that are not in accordance with law.

Plaintiff seeks an injunction prohibiting the federal Defendants from transferring title to any works, facilities, or lands that are subject of the Complaint (the "Transfer Lands") until BOR complies with the NEPA, NHPA, and APA. Plaintiff also seeks an injunction prohibiting the District from transferring any the Transfer Lands and prohibiting the District or any of its transferees, including Arizona Clean Fuels Yuma, LLC ("ACF"), from engaging in any land disturbing activities of any kind on the Transfer Lands prior to BOR's compliance with the NEPA, NHPA and APA. Finally, Plaintiff seeks an order voiding the property conveyances from BOR to the District and from the District to ACF to the extent necessary to ensure BOR's compliance with NEPA, NHPA and APA.

With the Complaint, Plaintiff filed an Application for Temporary Restraining Order and Order to Show Cause Why Preliminary Injunction Should Not Issue (Doc. # 5). Pursuant to a stipulation between the parties, the Court issued an Order prohibiting Defendants from transferring any Transfer Lands or conducting any ground disturbing activities on the Transfer Lands, except as necessary for the operation of the District in the ordinary course of business (Doc. # 19). The Order remains in effect until June 30, 2007, or until the Court issues its ruling on Plaintiff's application for preliminary injunction, whichever occurs first.

On May 31, 2007, the Court presided over a hearing on Plaintiff's application for preliminary injunction. Following the hearing and a review of the parties' submissions, the

Court hereby finds and concludes as follows:[3]

## I.      Findings of Fact

1.      The Gila Project is a federal water reclamation project originally authorized in 1937. In 1947, the Gila Reauthorization Act reauthorized the Gila Project and established the 75,000 acre Wellton-Mohawk Division.

2.      The District, an Arizona municipal corporation created in 1951, comprises the Wellton-Mohawk Division of the Gila Project.  The District provides domestic water, electrical power, flood control, and other community services to the Wellton and Mohawk Valleys in or about Yuma, Arizona.  The District's primary purpose is to divert and deliver Colorado River water to member lands for agricultural irrigation.  Each year, the District diverts over 278,000 acre feet of Colorado River water for delivery to its members.  The District currently provides water to farmers who irrigate approximately 63,000 acres of land in the Wellton-Mohawk Division of the Gila Project.

3.      Pursuant to contracts entered into with the Secretary of the Interior, the District is responsible for the operation, maintenance and repair of extensive irrigation and drainage facilities, including 378 miles of canals, laterals and return flow channels.

4.      Construction of the District's works and facilities involved a financial commitment by the District to repay the United States for the construction costs pursuant to its repayment contract with BOR.  The District has repaid the construction costs for the works and facilities and was provided a certificate of discharge on November 27, 1991.

5.       In 1998, the District and BOR signed the *Memorandum of Agreement between United States Department of the Interior Bureau of Reclamation Lower Colorado Region*

---

[3]The Court shall issue a separate Order addressing the Motion to Dismiss (Doc. # 39) filed by Wellton-Mohawk Irrigation and Drainage District and Charles Slocum and the Motion to Dismiss Complaint for Injunctive Relief (Doc. # 42) filed by Arizona Clean Fuels Yuma, LLC, and Glenn McGinnis.

*Yuma Area Office and Wellton-Mohawk Irrigation and Drainage District to Transfer Title to Works, Facilities, and Lands in the Wellton-Mohawk Division of the Gila Project, Arizona* ("MOA"). The MOA covers the details of a Title Transfer from the BOR to the District. The MOA provides that its purpose "is to define the method and principles by which title to the Gila Project-Wellton Mohawk Division works, facilities and certain federally-owned lands will be transferred from the United States to the District."

6. The Title Transfer involves transferring 47,538 acres of federally-owned lands to the District, including lands owned in fee simple and held as easements by the United States that contain the District's works and facilities, plus other lands and land interests held by BOR for other purposes. The District's works and facilities comprise approximately 28,197 acres. The other lands and rights comprise over 19,000 acres located both within or adjacent to the District. The Title Transfer also includes certain BOR lands withdrawn from public use and within or adjacent to the District.

7. In 2000, the Wellton-Mohawk Transfer Act ("Transfer Act") was enacted and authorized the Title Transfer as set forth in the MOA. The Transfer Act, in relevant part, provides:

> The Secretary of the Interior (Secretary) is authorized to carry out the terms of the Memorandum of Agreement No. 8-AA-34-WA014 (Agreement) dated July 10, 1998 between the Secretary and the Wellton-Mohawk Irrigation and Drainage District (District) providing for the transfer of works, facilities and lands to the District, including conveyances of Acquired Lands, Public Lands and Withdrawn Lands, as defined in the Agreement.

Pub. L. No. 106-221, § 2, 114 Stat. 351.

8. Under the Transfer Act and the applicable provisions of the MOA, the requirements for the Title Transfer are compliance with the NEPA, the NHPA and the District's payment of the appraised value for certain lands. The Act and MOA do not give BOR any authority or control over the District's future use or development of the Transfer Lands.

-4-

9.  BOR started the NEPA process with a meeting in September 2001.  In August 2003, BOR circulated, for public comment, a Draft Environmental Impact Statement ("DEIS") relating to the Title Transfer.  In the DEIS, the District identified 9,800 acres of Transfer Lands for commercial and industrial development in accordance with Yuma County's existing development plan.

10.  BOR described the scope of its environmental review in the DEIS as follows:

> The transfer of title to lands currently in federal ownership is an administrative action; however, changes in ownership could result in changes to land use.  Consequently, the focus of this EIS is on the effects of future District activities on lands within the District and within two or three miles of District boundaries.

DEIS at 1-4.

11.  BOR acknowledged that the future changes in land use on the Transfer Lands would not occur unless the Title Transfer is implemented, stating:

> future changes in land use by the District or its designees would not occur unless the title transfer is implemented. This change in land ownership could lead to changes in land use in the project area, which may result in direct or indirect impacts to the natural and/or developed environment. Thus, the potential impact of the Proposed Action has been assessed primarily on the basis of potential land use changes.

DEIS at 3-1.

12.  In its assessment of impacts to cultural resources, BOR notes:

> The project is an administrative action that would have limited potential for direct impacts. However, this assessment considers potential future actions that could occur within the land areas to be transferred and considers the potential effects of such actions in the absence of federal oversight.

DEIS at 3-32.

13.  While recognizing that the character of the vast majority of the Transfer Lands will remain "rural agricultural and open space," the DEIS references possible "industrial" development.  *See, e.g.,* DEIS at 3-6 ("The remaining 10 percent [of land within the Yuma County 2010 Plan] is divided into residential and industrial categories. … The

-5-

Yuma County 2010 Plan identified lands for community, commercial and industrial development along the Interstate 8 corridor"); DEIS at 3-9 ("Approximately 8,400 acres of land have been identified as candidate lands for community or commercial development over the next 30 years. … Most of candidate lands are adjacent to residential and industrial areas identified in the 2010 Plan"); DEIS at E-1 ("The project area is included in a recent countywide planning effort, which produced the *Yuma County 2010 Comprehensive Plan* … The remainder is in residential and industrial categories, with designated zones where development should occur"); DEIS at E-11 ("Most of candidate lands are adjacent to residential and industrial areas identified in the 2010 Plan").

14. In November 2003, Arizona Clean Fuels Yuma, LLC ("ACF") announced plans to locate an oil refinery in Yuma County. ACF identified two potential sites for the refinery with one on Transfer Lands and one on private land.

15. ACF preferred the Transfer Lands site and designated it as the site for the refinery. ACF also transferred the Arizona Department of Environmental Quality ("ADEQ") air permit to the Transfer Lands site. ACF agreed to purchase the Transfer Lands site from the District and focused significant resources and attention to the site.

16. During the NEPA process in 2004-2005, the refinery was known to the participants in the process and other interested parties, including Plaintiff. Plaintiff's representatives attended project meetings on September 29, 2004 and October 29, 2004, in which the BOR, Plaintiff and the District discussed the refinery and other possible land use projects, including industrial uses.

17. At the September 29, 2004, BOR meeting entitled "Wellton-Mohawk Title Transfer Project Update," the minutes reflect that "[t]he District does not have any hard plans or proposals other than the refinery and generating facility." *See* Doc. # 35-2, p. 38.

18. To implement the NHPA process, BOR "[i]n consultation with the SHPO [Arizona

State Historic Preservation Office] and Tribes, . . . designed and implemented a cultural resources program to determine the nature and extent of cultural resources on lands proposed for transfer, in accordance with 36 C.F.R. § 800.4." FEIS at 3-36. The program was conducted by an outside archaeological consulting firm, Statistical Research, Inc. ("SRI"). The first phase of the program involved a class I inventory (literature and archival search) of archaeological investigations in the lower Gila Valley. The original proposed action involved approximately 57,000 acres. SRI analyzed those 57,000 acres plus a 2.5 mile buffer around the perimeter of those lands.

19. The second phase of the program involved a class II/III inventory of approximately 5,900 acres of undisturbed land by pedestrian surveys. BOR and SRI focused the survey on undisturbed lands most likely to contain eligible sites. BOR determined that the majority of the Transfer Lands were unlikely to have intact cultural resources due to extensive prior usage and disturbance. SRI also conducted a geomorphic analysis of the project area. In February 2005, the District and BOR removed 2,124 acres of culturally sensitive lands from the Title Transfer. Based on the continued concerns of certain consulting tribes, BOR decided to inventory the remainder of undisturbed lands. SRI conducted a class III inventory of 4,833 acres of undisturbed lands in the Title Transfer.

20. As ultimately configured, the Title Transfer involves 47,538 acres containing 19 eligible properties (5 historic, 13 prehistoric and one mixed). The Arizona State Historic Preservation Office ("ASHPO") concurred with BOR's eligibility determinations by letters dated November 28, 2005, and May 1, 2006.

21. In a letter dated January 22, 2007, the Advisory Council on Historic Preservation ("ACHP") approved BOR's cultural resource investigation, and specifically determined "that BOR has made a reasonable and good faith effort to identify archaeological properties listed on or eligible for the national register. A 100 percent survey of

affected lands, locating all historic properties within the area of potential affects, is not a requirement of the ACHP's regulations."   Letter to Jim Cherry, Bureau of Reclamation, from Reid J. Nelson of the Advisory Council on Historic Preservation dated January 22, 2007.

22.   BOR determined that "the surveys conducted for this project constitute the most comprehensive cultural resource inventory conducted in this region to date."  FEIS at 3-34.  "Based on the overall survey results, approximately 92.5 percent of significant cultural resources were identified in the project area."  FEIS at 3-38.

23.   Throughout the NHPA process, BOR and the District consulted Plaintiff and requested identification of eligible sites.  Plaintiff failed to identify any specific Traditional Cultural Properties ("TCPs") or other eligible sites in the Title Transfer area that BOR did not investigate or consider.  Consultation with various Indian Tribes began in 2003 and continued for the last four years.  BOR conducted monthly tribal consultation meetings since July 2004 and made numerous concessions as a result of tribal concerns. BOR conducted over thirty informational and government-to-government meetings with various Indian Tribes, including Plaintiff.  Despite those meetings, "the Quechan Tribe has not identified any specific TCPs or other eligible sites in the Title Transfer Area that Reclamation failed to investigate or consider."  ROD at 11.

24.   In December 2006, BOR issued the Final Environmental Impact Statement ("FEIS") for the Title Transfer.  The FEIS contains an analysis of the potential environmental impacts resulting from transfer of title to 47,538 acres of works, facilities and lands to the District.

25.   On or about January 30, 2007, the District received a copy of a letter from Plaintiff's attorneys requesting that "Reclamation postpone issuance of the ROD and the land transfer until the Tribe's concerns have been resolved."  Plaintiff's attorneys thereafter met with and corresponded with representatives of BOR and BOR delayed issuance of

1     the ROD until March 26, 2007.

2    26.    On March 26, 2007, BOR issued the *Record of Decision of the Lower Colorado Region*

3    *for the Wellton-Mohawk Title Transfer, Yuma County* dated March 26, 2007 ("ROD"),

4    approving the Title Transfer as set forth under the Transfer Act. As noted in the ROD,

5    the Title Transfer will be implemented through quit claim deeds issued by BOR to the

6    District. The lands that contain the District's works, facilities and improvements have

7    been subject to extensive prior use and disturbance. Under the Title Transfer,

8    ownership of the works and facilities and associated lands have been transferred to the

9    District. The Title Transfer has not changed the purpose, operation or use of the

10    District's works and facilities.

11    27.    BOR addressed the refinery in the FEIS, primarily in the discussion of cumulative

12    effects. BOR also addressed the refinery in the ROD issued on March 26, 2007,

13    including responses to the concerns filed by Plaintiffs on January 30, 2007, relating to

14    the proposed refinery:

15            The District's negotiations with ACF began several years after
passage of the Act. ACF has considered several possible
16            locations for its proposed oil refinery, including sites not included
in the Title Transfer Area. Under NEPA, it is Reclamation's
17            responsibility to describe direct, indirect and cumulative impacts
within its control and responsibility. Reclamation does not have
18            any control over the location and siting of the proposed oil
refinery in implementing the Title Transfer with the District, and
19            there is no causal connection between the Title Transfer and a
third party proposal to locate an oil refinery in the Wellton-
20            Mohawk Valley. The possible oil refinery will stand or fall on its
own merits. The proposed oil refinery is not a reasonably
21            foreseeable result of the Title Transfer with the District. Further,
if the proposed oil refinery is developed at some point in the
22            future, it would be considered a federal undertaking and would
require permits from several Federal agencies. The project would
23            be subject to a separate NEPA analysis and compliance with
Section 106 of the National Historic Preservation Act. If the
24            District sells land to ACF, there are no guarantees that the
refinery will be built. Should plans for the refinery move
25            forward, the tribes and public will have ample opportunity to
comment on significant impacts to cultural or other resources.

26

1    ROD at 9.  *See also* ROD at 8-11.

2    28.    In the FEIS, BOR explained that the refinery project "anticipates a significant degree

3           of federal, state, and local government interaction, coordination, and approval." FEIS

4           at 1-12.  BOR also identified federal and state permits required for construction of the

5           refinery project, including a permit under the Clean Water Act, a Presidential Permit

6           for the oil pipeline, consultation under the Endangered Species Act, an NHPA cultural

7           resource analysis, and a NEPA review process to be completed by BLM and other

8           federal agencies.  BOR determined that "construction of the refinery [cannot] occur

9           until the NEPA review" is completed by BLM and other federal agencies. FEIS at 1-12.

10          *See also* FEIS at 1-5.

11   29.    Indeed, the permitting of an oil refinery is a complex process that requires numerous

12          local, state, federal, and international permits and approvals.  ACF has begun this

13          extensive permitting for the refinery.  ACF has obtained an air permit from ADEQ and,

14          at ACF's request, Yuma County has revised its Master Plan to accommodate the zoning

15          of the ACF Land for intensive industrial use.  Prior to construction, ACF must work

16          with the Bureau of Land Management ("BLM"), BOR, Department of State,

17          Department of Defense, Department of Energy, and Yuma County to complete the

18          NEPA process and obtain the required permits and approvals.

19   30.    The NEPA process for the refinery will be triggered by the following four actions: (1)

20          ACF must obtain an interconnection agreement from the Western Area Power

21          Administration, an agency of the Department of Energy; (2) ACF must obtain right of

22          ways from BLM for supply pipelines and infrastructure for the refinery; (3) ACF must

23          obtain approval of supply pipelines from the Federal Energy Regulatory Commission;

24          and (4) ACF must obtain rights of way from the Department of Defense for supply

25          pipelines and infrastructure for the refinery.  Approval of each action is contingent

26          upon completion of the NEPA process, which includes a NHPA analysis.

-10-

31.   In addition to the NEPA process, ACF must obtain the following permits to construct the refinery: (1) a Section 404/401 Permit from the U.S. Army Corps of Engineers; (2) a Presidential Permit from the Department of State; (3) a Section 107 compliance authorization from the U. S. Fish and Wildlife Service; (4) rights of way from local, state, and federal governments; and (5) numerous local zoning and permitting approvals.

32.   On April 10, 2007, ACF requested that the District file an interconnection request with the Western Area Power Administration for electric transmission services.  On April 12, 2007, an interconnection request was filed.  Consequently, the NEPA process for the proposed refinery has begun.

33.   Following issuance of the ROD, BOR conveyed the works and facilities and associated lands to the District by Quit Claim Deed recorded on March 26, 2007, with the Yuma County Recorder.  The lands transferred to the District on March 26, 2007, comprise 39,142.21 acres.  The District conveyed 1,460 acres of that land to ACF on March 26, 2007.  The lands transferred to the District on March 26, 2007, and the lands transferred from the District to ACF on March 26, 2007, do not contain any known cultural resources or eligible sites.  The 19 known eligible sites occur on Transfer Lands which have not been conveyed by BOR to the District, and those lands will remain in federal ownership until the Section 106 process under the NHPA is completed with respect to those lands.

**II.   Conclusions of Law**

    **A.   Jurisdiction and Venue**

1.   This action involves judicial review of an administrative action of the BOR arising under the APA, the NEPA and the NHPA.  The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

2.   Venue is proper in the United States District Court for the District of Arizona pursuant

-11-

to 28 U.S.C. § 1391, as the claims alleged in this action relate to land located in Yuma County, Arizona.

**B.    Preliminary Injunction Standard**

3.    The purpose of a preliminary injunction is to preserve the status quo among the parties pending a final decision on the merits of the action. *See* Fed. R. Civ. P. 65; *Dep't of Parks and Recreation v. Bizarre del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2000). Under Ninth Circuit law,

> "[t]he standard for granting a preliminary injunction balances the plaintiff's likelihood of success against the relative hardship to the parties." We have described two sets of criteria for preliminary injunctive relief. Under the "traditional" criteria, a plaintiff must show "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." Alternatively, a court may grant the injunction if the plaintiff "demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor."

> As we have said many time regarding the two alternative formulations of the preliminary injunction test: "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but rather outer reaches of a single continuum."

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005) (citations omitted). Under NEPA and NHPA, a grant of injunctive relief is an extraordinary remedy that involves the balancing of equities and requires a fact specific analysis of the circumstances of an individual case considering the harms of granting and denying relief to each party. *Weinburger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982). Because injunctions are equitable remedies, they do not issue "as a matter of course." *Id.* at 311. A violation of NEPA or the NHPA alone does not compel the issuance of an injunction. *Forest Cons. Council v. U.S. Forest Service*, 66 F.3d 1489, 1496 (9th

-12-

Cir. 1995).

**C.    Standard of Review**

4.     The APA governs judicial review of agency decision under NEPA and NHPA. *Anderson v. Evans,* 371 F.3d 475, 486 (9th Cir. 2004).  In order to prevail on the merits of its claims, Plaintiff must demonstrate that BOR's actions were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 763 (2004). Under that standard, this Court applies a narrow and deferential standard of review:

> [I]n making the factual inquiry concerning whether an agency decision was "arbitrary or capricious," the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one."

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989); *see also Klamath-Siskiyou Wildlands Ctr. v. Bur. of Land Man.*, 387 F.3d 989, 993 (9th Cir. 2004).

5.     BOR's decision may be overturned only if the agency "committed a clear error in judgment." *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1114-15 (9th Cir. 2000), quoting *Northwest Envtl. Defense Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997).  In applying the arbitrary and capricious standard, this Court is "not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

**D.    National Environmental Policy Act**

6.     NEPA is a procedural statute intended to make federal agencies aware of the impact of their decisions on the human environment. *Public Citizen,* 541 U.S. at 756-757. NEPA does not dictate substantive results or expand agency jurisdiction over land uses:

> [I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. .

-13-

> . . If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs … Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed--rather than unwise--agency action.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).  *See also Cold Mountain v. Garber*, 375 F.3d 884, 892 (9th Cir. 2004).

7. NEPA requires agencies to prepare an environmental impact statement for major federal actions "significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  NEPA does not mandate any particular result, but makes sure that federal agencies take a "hard look" at the environmental consequences of a proposed action.  *Robertson*, 490 U.S. at 350.  Ultimately, "NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring federal agencies to undertake analyses of the environmental impact of their proposals and actions."  *Public Citizen*, 541 U.S. at 756-57.  In this case, NEPA does not give BOR any substantive authority over uses of the Transfer Lands or the proposed refinery project.  *Id*. at 766-68.

**E.    National Historic Preservation Act**

8. "Although the obligations imposed by NHPA are 'separate and independent from those mandated by NEPA, . . . the two statutory schemes are closely related."  *Apache Survival Coalition v. United States*, 21 F.3d 895, 906 (9th Cir. 1994).  "Both Acts create obligations that are chiefly procedural in nature; both have the goal of generating information about the impact of federal actions on the environment; and both require that the relevant federal agency carefully consider the information produced."  *San Carlos Apache Tribe. v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005) citing *Pres. Coalition, Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982).

9. The NHPA directs federal agencies to consider the effects of their "undertakings" on

-14-

historic properties included in, or eligible for inclusion in, the National Register of Historic Places and to consult with certain interested parties.  16 U.S.C. § 470(f). Regulations implementing NHPA have been adopted by the ACHP.  *See* 36 C.F.R. Part 800.  The procedures required under § 106 of the NHPA require an agency to identify historic properties or eligible properties within the area of potential environmental impact before approving the action.  36 C.F.R. § 800.4.  Section 800.4(b)(1) of the NHPA requires the following action by the agency regarding identification of cultural resources:

> The agency official shall make a reasonable and good faith effort to carry out appropriate identification efforts, which may include background research, consultation, oral history interviews, sample field investigations and field survey.  The agency official shall take into account past planning, research and studies, the magnitude and nature of the undertaking, and the degree of Federal involvement, the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects.

36 C.F.R. § 800.4(b)(1).  Like NEPA, the NHPA "does not itself require a particular outcome, but rather ensures that the relevant federal agency will, before approving funds or granting a license to the undertaking at issue, consider the potential impact" on historic places.  *Business & Residents Alliance v. Jackson*, 430 F.3d 584, 591 (2d Cir. 2005).

**F.     Discussion**

10.     Plaintiff asserts four arguments in support of its application for a preliminary injunction.  First, Plaintiff argues that BOR violated NEPA by failing to adequately analyze the impacts from the proposed refinery.  Second, Plaintiff argues that BOR failed to supplement its Draft EIS.  Third, Plaintiff argues that BOR's cumulative analysis in the FEIS violated NEPA. Finally, Plaintiff argues that BOR violated the NHPA by failing to adequately identify the presence of cultural resources on the Transfer Lands.

-15-

**1.      Analysis of Impact of Future Development by Third Parties**

11.    Plaintiff argues that BOR is required to take a "hard look" at all reasonably foreseeable impacts of the Title Transfer.  In this regard, Plaintiff claims that BOR violated NEPA because it failed to perform an analysis of the proposed oil refinery that might be constructed on 1,460 acres of land the District conveyed to ACF or any other potential industrial development.  As for the refinery, Plaintiff explains that the Title Transfer allows the refinery project to exist and, based on that causation argument, concludes that BOR failed to properly analyze the refinery and its environmental impacts as part of the FEIS.

12.    BOR is required to take a "hard look" at the environmental consequences of its actions.  *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002) citing *Marsh*, 490 U.S. at 374.  "This includes considering all foreseeable direct and indirect impacts."  *Id*. citing *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975).  Direct impacts "are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  Indirect impacts "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id*.

13.    The Supreme Court has limited the circumstances under which an action can be considered the direct or indirect cause of an impact.  In *Public Citizen*, *supra*, the Supreme Court stated that a "but for" causal relationship between an agency's action and an environmental effect "is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations . . . NEPA requires a 'reasonably close causal relationship' between the environmental effect and the alleged cause."  *Public Citizen*, 541 U.S. at 767, citing *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983).  In *Metropolitan Edison*, the Supreme Court explained that "[s]ome effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation, will nonetheless not fall within [NEPA]

-16-

because the causal chain is too attenuated." 460 U.S. at 774.  Particularly, "courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not."  *Id.* at 774, n. 7.  In drawing such a "manageable line," the Supreme Court in *Public Citizen* found that it was improper to consider an agency's action to be the cause of an impact when the agency has limited authority to prevent the impact, stating:

> We hold that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the *relevant* actions, the agency cannot be considered a legally relevant 'cause' of the effect.  Hence, under NEPA and the implementing CEQ regulations, the agency need not consider these effects in its EA when determining whether an action is a 'major federal action.'

*Id.* at 770 (italics added).

14.    As the Court interprets *Public Citizen*, the "relevant action" at issue herein is the locating and constructing of the proposed refinery.  It is not, as Plaintiff argues, the implementation of the Title Transfer.  This is because, in *Public Citizen*, while the agency had authority to implement safety regulations concerning Mexican motor carriers entering the United States, it did not need to consider the environmental impact caused by the increased presence of Mexican motor carriers because the President had the authority to modify the moratorium on the entry of Mexican motor carriers.  As such, the "relevant action" referenced in *Public Citizen* is not the agency's implementation of the safety regulations, but instead is the President's modification of the moratorium.  Thus, *Public Citizen* clearly concludes that the agency, which had no ability to prevent the environmental effects in light of its limited authority over the President's modification of the moratorium, had no duty to consider the environmental impact of increased presence of Mexican motor carriers.

15.    In this case, the Transfer Lands are not being transferred for the purpose of the

-17-

proposed refinery.   Under *Public Citizen*, BOR has no ability to prevent the environmental effects of the proposed refinery because BOR has no authority over the existence, location or construction of the refinery (the "relevant action").   Therefore, despite recognizing that future changes in land use on the Transfer Lands would not occur unless the Title Transfer is implemented, BOR had no duty to consider the environmental impact of the proposed refinery.   BOR clearly recognized this limitation on its obligations in the FEIS.   The Court finds that BOR reasonably determined that it "does not have any control over the location or siting of the proposed oil refinery in implementing the Title Transfer with the District, and there is no causal connection between the Title Transfer and a third party proposal to locate an oil refinery in the Wellton-Mohawk Valley." ROD at 9.   BOR also reasonably determined that the Title Transfer and the refinery project are not "connected actions" under 40 C.F.R. § 1508.25.   The record is clear that (i) the Title Transfer does not automatically trigger the refinery project, (ii) the refinery project may proceed on private land with or without the Title Transfer and (iii) the Title Transfer and refinery are not interdependent parts of a larger action.

16.   In reaching the above result, the Court rejects Plaintiff's attempt to distinguish *Public Citizen*.   Plaintiff focuses on the wrong "relevant action."   Instead of focusing on the proposed refinery, Plaintiff focuses on BOR's authority to implement the Title Transfer. As *Public Citizen* instructs, this is improper.

17.   Second, the Court finds that BOR did not need to consider the refinery in its NEPA process because the refinery is subject to a separate NEPA process.   The NEPA process has two purposes.   First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson,* 490 U.S. at 349.   Second, it "guarantees that the relevant information will be made available to the larger audience that may also play

-18-

1       a role in both the decisionmaking process and the implementation of that decision." *Id.*

2  18.    The Court finds that requiring BOR to consider the effects of a refinery that will be

3          subject to its own detailed NEPA process fulfills neither of these purposes.  Since BOR

4          has no ability to prevent the construction of the refinery or to even determine its

5          impacts, the refinery's environmental impact would have no effect on BOR's

6          decisionmaking regarding the land transfer.

7  19.    As discussed, at least four other federal agencies must approve the refinery prior to its

8          construction.  Each will require detailed information regarding the environmental

9          impacts of the refinery.  Such information will be assembled in the separate NEPA

10        process conducted for the refinery.  Plaintiff's concerns outlined in the Complaint can

11        be raised and addressed in this separate NEPA process.

12  20.    Similarly, the Court finds that NEPA's informational purpose would not be served by

13        requiring BOR to consider the impacts of the refinery.  The "informational role" of an

14        EIS is to "giv[e] the public the assurance that the agency 'has indeed considered

15        environmental concerns in its decisionmaking process,' and, perhaps more significantly,

16        provides a springboard for public comment" in the agency decisionmaking process

17        itself.  *Robertson*, 490 U.S. at 349 (citations omitted).  Here, the public can have no

18        effect on BOR's decisionmaking regarding the land transfer since BOR has no ability

19        to prevent the construction of the refinery.  Instead, the public will have ample

20        opportunity to participate in the NEPA process for the refinery.  The public may submit

21        comments regarding the refinery, participate in public meetings, and, if appropriate,

22        obtain judicial review of the agency's determination.  NEPA's second purpose is

23        guaranteed to be fulfilled in the NEPA process for the refinery.

24  21.    Finally, even if BOR was required to consider the environmental impacts of the

25        refinery, the Court finds that BOR adequately discussed and addressed the refinery in

26        the DEIS and the FEIS.  Specifically, in the DEIS, BOR considered that economic and

industrial development would occur on the transferred land on pages ES-5, 1-4, 3-3, 3-4, 3-6, 3-7, 3-8, 3-9, 3-10, 3-48, 3-49, 4-1, 4-2, & Appendix E.  As these citations of the DEIS demonstrate, BOR adequately considered potential impacts of commercial and industrial development on the land transfer.

22.  After ACF notified BOR of the proposed refinery, BOR published the FEIS, which included extensive discussion of the refinery.  The refinery was discussed on pages 1-5, 1-7, 1-11, 1-12, 1-13, Map 1-3, 1-13, 2-3, 2-9 and throughout Chapter 3, Chapter 4, Appendix E, and Appendix F.  In fact, the FEIS contains a separate section – Section 1.6.6 – that specifically addresses the refinery.  As these citations demonstrate, the FEIS contained a detailed discussion regarding the refinery and its potential impacts.  The discussion demonstrates that BOR took a "hard look" at the potential refinery.

23.  On January 30, 2007, after the FEIS was published, Plaintiff raised numerous concerns regarding the refinery in a letter to BOR.  BOR addressed each of Plaintiff's concerns in the ROD issued on March 26, 2007.  In light of BOR's additional step, it is clear that BOR considered the potential environmental impacts of the refinery and that the goals of NEPA were accomplished.

24.  In finding that BOR adequately discussed and addressed the refinery, the Court rejects Plaintiff's argument that BOR abdicated its responsibilities under the NEPA by referencing the additional NEPA and permitting processes for the refinery.  The fact that BOR considered and identified the additional processes required prior to construction of the refinery is further evidence that BOR conducted a thorough analysis under the NEPA, i.e., a "hard look."  As such, the Court rejects Plaintiff's argument that *State of Idaho v. ICC*, 35 F.3d 585 (D.C.Cir. 1994), wherein the agency declined to prepare an EIS, is applicable.

25.  The Court also notes that its discussion concerning the proposed oil refinery applies with equal force to Plaintiff's argument that BOR failed to consider the environmental

1    impact of any other possible industrial development on the Transfer Lands.  The Court

2    notes that a "manageable line," as discussed in *Metropolitan Edison*, cannot mean that

3    BOR must analyze every possible and/or conceivable industrial development of the

4    Transfer Lands.  Such an exercise would be extremely burdensome and likely would

5    ultimately prove futile in light of the uncertainty surrounding the potential industrial

6    development of the Transfer Lands.  Instead, as BOR did herein, it is reasonable to

7    defer to the future permitting and NEPA/NHPA processes.

8    26.  For purposes of this review, the Court cannot substitute its judgment for that of BOR,

9    but rather must uphold BOR's decision as long as it has "considered the relevant factors

10   and articulated a rational connection between the facts found and the choice made."

11   In light of the cited discussions, the DEIS and FEIS's form, content, and preparation

12   fostered informed decisionmaking by BOR and complied with NEPA.

13   **2.    Duty to Supplement the Draft Environmental Impact Statement**

14   27.  Plaintiff argues that BOR had a duty to issue a supplemental DEIS to address the

15   proposed refinery.  Federal regulations require supplementation when either: "(i) [t]he

16   agency makes substantial changes in the proposed action that are relevant to

17   environmental concerns; or (ii) [t]here are significant new circumstances or information

18   relevant to environmental concerns and bearing on the proposed action or its impacts."

19   40 C.F.R. 1502.9(c)(i) & (ii).

20   28.  In *Marsh*, *supra*, the United States Supreme Court noted that agencies should apply a

21   "rule of reason" to the decision to prepare a supplemental EIS.  *Marsh*, 490 U.S. at 373.

22   The Court further noted that a supplemental EIS is not required every time new

23   information or circumstances comes to light, as agencies would always be waiting and

24   supplementing.  *Id*.  Rather, the Court held:

25          Application of the "rule of reason" thus turns on the value of the
            new information to the still pending decisionmaking process . . .
26          . If there remains "major federal action" to occur, and if the new

-21-

information is sufficient to show that the remaining action will "affect the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplement . . . [impact statement] must be prepared.

*Id*. at 374.

29.    Plaintiff claims that the DEIS failed to reference possible industrial development on the Transfer Lands.  However, as stated in the DEIS, the District identified 9,800 acres of Transfer Lands for commercial and industrial development in accordance with Yuma County's existing development plan.  The DEIS contains multiple references to possible "industrial" development.  *See, e.g.,* DEIS at 3-6, 3-9, E-1, E-11.  Thus, the Transfer Lands were identified as lands available for development in accordance with the 2010 Yuma County Comprehensive Plan, which specifically references commercial and industrial development.  BOR also held meetings attended by Plaintiff's representatives in 2004 during which the refinery project was discussed.

30.    Further, BOR discussed the refinery in the FEIS and ROD.  However, BOR recognized that the refinery was a separate project subject to its own intensive NEPA and permitting process.  BOR also recognized that the refinery has no bearing on the Title Transfer because BOR has no control or authority over the refinery project or other future uses of the Transfer Lands.  Accordingly, BOR's conclusion that a supplemental EIS was not necessary was properly based on a consideration of the relevant factors, was not arbitrary or capricious, and is fully consistent with the *Marsh* "rule of reason." Under these circumstances, the Court rejects Plaintiff's supplementation argument under 40 C.F.R. § 1502.9(c)(1)(ii).

### 3.    Cumulative Impact Analysis

31.    Plaintiff argues that development of the refinery on Transfer Lands will have the cumulative impact of enticing other industrial development in the area.  Plaintiff then argues that BOR failed to consider those cumulative impacts in the FEIS.  Plaintiff also

-22-

1   argues that BOR improperly addressed the proposed refinery in the cumulative impact
2   section because the refinery is an indirect impact of the Title Transfer, not a cumulative
3   impact.  This Court rejects Plaintiff's arguments and finds that BOR's cumulative
4   impacts analysis in the FEIS complies with NEPA.

5   32.   The Court already has found that the proposed refinery is not an impact, direct or
6         indirect, of the Title Transfer.  As such, Plaintiff's argument that BOR improperly
7         addressed the proposed refinery in the cumulative impact section is rejected.

8   33.   "Cumulative impacts" are defined as the "impact on the environment that results from
9         the incremental impact of the action when added to other past, present and reasonably
10        foreseeable future actions."  40 C.F.R. § 1508.7.  To determine whether cumulative
11        impacts must be included in a discussion of environmental impacts, the Ninth Circuit
12        applies the federal regulation that all "reasonably foreseeable" actions that have
13        potential cumulative impacts must be addressed.  *See, e.g., Blue Mountains Biodiverity*
14        *Project v. Blackwood,* 161 F.3d 1208 (9th Cir. 1998).

15  34.   The United States Supreme Court considered the issue of when cumulative impacts in
16        *Kleppe v. Sierra Club*, 427 U.S. 390 (1976).  In *Kleppe*, the Court noted that an agency
17        is not required "to consider the possible environmental impacts of less imminent actions
18        when preparing the impact statement on proposed actions.  Should contemplated
19        actions later reach the stage of actual proposals, impact statements on them will take
20        into account the effect of their approval upon the existing environment." *Kleppe*, 427
21        U.S. at 420 n. 20.  Thus, an environmental impact statement is not required for
22        speculative or contemplated actions.

23  35.   The court in *National Wildlife Federation v. FERC*, 912 F.2d 1471, 1478 (D.C.Cir.
24        1990), further explained:

25            *Kleppe* thus clearly establishes that an EIS need not delve into the
26            possible effects of a hypothetical project, but need only focus on
              the impact of the particular proposal at issue and other pending or

-23-

recently approved proposals that might be connected to or act cumulatively with the proposal at issue.

36.  For purposes of its NEPA cumulative impact analysis, BOR determined that the refinery and other possible industrial development were merely contemplated or speculative.  BOR correctly noted that the refinery is still in the design, financing, and permitting phase.   The refinery also is speculative because its construction and operation is contingent upon numerous local, state, and federal permits and approvals. If any of the approvals or permits are not obtained, the refinery cannot be built.  In light of the numerous permits and authorizations required, and despite Plaintiff's argument that the refinery was previously described in the NEPA process as a "hard plan," the Court finds that BOR's determination that the refinery is speculative is a reasonable and rationale conclusion.

37.  Additionally, ACF has argued that the location of the refinery remains speculative. ACF has under consideration two locations for the refinery.  While ACF prefers to build the refinery on the Transfer Lands site, the exact location has always been contingent upon many factors.  Further, ACF also has the right to relocate the refinery under ADEQ regulations.  The fact that ACF previously transferred its air permit to the Transfer Lands site demonstrates this point.

38.  Since the Court finds that the refinery is only a "hypothetical project," not an "actual proposal," it only follows that other possible industrial development also is speculative in nature and not necessary to be addressed in the cumulative impact statement.

39.  Under these circumstances, the discussion of cumulative impacts contained in chapters 3 and 4, and Appendix E, of the FEIS, including BOR's discussion of the refinery, was reasonable and appropriate, and Plaintiff has not demonstrated any clear error of judgment in BOR's cumulative impacts analysis in the FEIS.

-24-

**4.    Cultural Resources**

40.    Plaintiff argues that BOR violated the NHPA by failing to adequately identify the presence of cultural resources on the Transfer Lands. Specifically, Plaintiff takes issue with BOR's survey, according to Plaintiff's calculations, of only 17% of the Transfer Lands.

41.    Based on the underlying record, the Court finds that BOR conducted a reasonable and good faith investigation of cultural resources in the Transfer Lands as required by 36 C.F.R. § 800.4(b)(1). Neither the NHPA nor the ACHP regulations require BOR to conduct a complete survey of all 47,538 acres of Transfer Lands. In its January 22, 2007 letter, the ACHP approved BOR's surveys and expressly determined that the NHPA regulations do not require BOR to survey 100% of the Transfer Lands. *See also Wilson v. Block*, 708 F.2d 735, 754 (D.C. Cir. 1983) ("the [ACHP] regulations do not expressly require agencies in all cases completely to survey impact areas, and in fact recognize that the need for survey will vary from case to case."); *National Indian Youth Council v. Watt*, 664 F.2d 220, 228 (10th Cir. 1981) (upholding partial survey because "the argument that a complete survey must be made of 40,000 acres before mining begins on eight acres borders on the absurd").

42.    As stated in the ROD, a federal agency is required to make a reasonable and good faith effort to identify archaeological properties eligible for the National Register. The Arizona SHPO and more recently, the Advisory Council on Historic Preservation, concluded that BOR's identification effort was adequate and satisfied Section 106 requirements. Thus, BOR has satisfied its obligations to make a reasonable and good faith effort to identify eligible sites in the Title Transfer Area. Based on the underlying record, BOR's findings and determinations on these issues are entitled to deference and Plaintiff is not likely to succeed on the merits of its NHPA claims.

43.    The Court finds that Plaintiff fails to demonstrate a strong likelihood of prevailing on

-25-

the merits of its NEPA and NHPA claims. Based on the underlying record, the Court finds that BOR took the requisite "hard look" and reasonably analyzed the environmental and cultural resources impact of the Title Transfer.

### 5. Irreparable Harm

44. The Court further finds that Plaintiff has failed to demonstrate that it will suffer irreparable harm or that there is even a possibility of irreparable harm in this matter. Plaintiff will not suffer harm because the refinery has been and will be subject to extensive permitting from local, state, and federal agencies. As a practical matter, ACF must obtain all permits before it begins construction of the refinery. This process will take a substantial amount of time. There is no possibility of harm to Plaintiff until all of the permits are issued and this is unlikely to occur prior to the hearing on the Plaintiff's Complaint. Further, construction of the refinery cannot occur until the NEPA and NHPA process is completed. As the current NEPA process demonstrates, NEPA is a detailed and time consuming process. The NEPA process will address all of Plaintiff's concerns and will provide ample opportunity for public comment regarding the refinery. This additional process will prevent any harm or even the possibility of harm to Plaintiff.

## III. Conclusion

Based on the underlying record and parties' submissions, the Court concludes that Plaintiff has failed to show a strong likelihood of success on the merits because BOR has taken the requisite "hard look" at the environmental and cultural consequences of the Title Transfer. Further, the Court concludes that Plaintiff has failed to demonstrate that it will suffer irreparable harm or that there is a possibility of irreparable harm in this matter. Accordingly, the Court will deny Plaintiff's application for a preliminary injunction.

For the foregoing reasons,

**IT IS ORDERED** that Plaintiff's Application for Preliminary Injunction (Doc. # 5) is DENIED;

**IT IS FURTHER ORDERED** that Wellton-Mohawk Irrigation and Drainage District's Motion to Strike Extra-Record and Inadmissible Evidence (Doc. # 38) is DENIED because the evidence complained of was not considered by the Court;

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Defer Scheduling the Rule 16 Preliminary Pre-Trial Conference Until Pending Motions are Resolved (Doc. # 55) is DENIED;

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Inadmissible Evidence in Declaration of Charles W. Slocum (Doc. # 57) is DENIED.

DATED this 29th day of June, 2007.

_____
James A. Teilborg
United States District Judge

-27-