**WO**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| QUECHAN INDIAN TRIBE OF THE FORT YUMA INDIAN RESERVATION, a federally recognized Indian Tribe, | No.: CV 07-0677-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| U.S. DEPARTMENT OF THE INTERIOR, ET AL., | |
| Defendants. | |

Pending before the Court are Plaintiff's Motion for Summary Judgment (Doc. # 128), Arizona Clean Fuels Yuma, LLC's and Glenn McGinnis' Motion for Summary Judgment (Doc. # 129), Wellton-Mohawk Irrigation and Drainage District's Motion for Summary Judgment (Doc. # 130), Federal Defendants' Motion for Summary Judgment (Doc. # 134), and Wellton-Mohawk Irrigation and Drainage District's Motion to Strike Portions of Plaintiff's Statement of Facts in Support of Motion for Summary Judgment (Doc. # 138).

I.    **Introduction**

On March 30, 2007, the Quechan Indian Tribe of the Fort Yuma Indian Reservation ("Plaintiff") filed a Complaint for Injunctive Relief against numerous federal Defendants[1] and

---

[1]The federal Defendants are: (1) U.S. Department of the Interior; (2) Dirk Kempthorne, as Secretary of the Interior; (3) U. S. Bureau of Reclamation; (4) Robert W. Johnson, as Commissioner, U.S. Bureau of Reclamation; (5) Larry Walkoviak, as Acting Regional Director, Lower Colorado Region, U.S. Bureau of Reclamation; (6) Jayne Harkins, as Acting Regional Director, Lower Colorado Region, U.S. Bureau of Reclamation; and (7) Jim Cherry,

non-federal Defendants.[2]  In the Complaint, Plaintiff alleges that the Bureau of Reclamation ("BOR") violated the National Environmental Policy Act of 1969, 42 U.S.C. § 4332, *et seq.* ("NEPA") and the National Historic Preservation Act, 16 U.S.C. § 470, *et seq.* ("NHPA") by failing to properly analyze the potential environmental and cultural resources impact resulting from the transfer of federal land to the Wellton-Mohawk Irrigation and Drainage District ("District").  Plaintiff also alleges that BOR violated the Wellton-Mohawk Transfer Act of 2000 by transferring federal land for purposes of developing an oil refinery.  Finally, Plaintiff alleges that BOR violated the Administrative Procedures Act, 5 U.S.C. § 706(2)(A) ("APA"), by engaging in actions that are not in accordance with law.

Plaintiff seeks an injunction prohibiting the federal Defendants from transferring title to any works, facilities, or lands that are subject of the Complaint (the "Transfer Lands") until BOR complies with NEPA, the NHPA, and the APA.  Plaintiff also seeks an injunction prohibiting the District from transferring any Transfer Lands and prohibiting the District or any of its transferees, including Arizona Clean Fuels Yuma, LLC ("ACF"), from engaging in any land disturbing activities of any kind on the Transfer Lands prior to BOR's compliance with the NEPA, the NHPA and the APA.  Finally, Plaintiff seeks an order voiding the property conveyances from BOR to the District and from the District to ACF to the extent necessary to ensure BOR's compliance with NEPA, the NHPA and the APA.

With the Complaint, Plaintiff filed an Application for Temporary Restraining Order and Order to Show Cause Why Preliminary Injunction Should Not Issue (Doc. # 5).  Pursuant to a stipulation between the parties, the Court issued an Order prohibiting Defendants from transferring any Transfer Lands or conducting any ground disturbing activities on the Transfer Lands, except as necessary for the operation of the District in the ordinary course of business

---

as Area Manager, Yuma Area Office, U.S. Bureau of Reclamation.

[2]The non-federal Defendants are: (1) Wellton-Mohawk Irrigation and Drainage District; (2) Charles W. Slocum, as Wellton-Mohawk General Manager; (3) Arizona Clean Fuels Yuma, LLC; and (4) Glenn McGinnis, as Chief Executive Officer, Arizona Clean Fuels Yuma, LLC.

*See* Doc. # 19.

On April 20, 2007, the non-federal Defendants filed motions to dismiss seeking dismissal of the Complaint as against them.  On May 31, 2007, the Court presided over a hearing on Plaintiff's application for preliminary injunction.  Following the hearing, the Court denied the preliminary injunction.  *See* Doc. # 85.  Thereafter, the Court denied in part and granted in part the non-federal Defendants' motions to dismiss, concluding that Plaintiff could not seek affirmative relief in the form of an injunction against the non-federal Defendants, but that the non-federal Defendants were properly joined as to Plaintiff's claim that the property conveyances should be voided.  *See* Doc. # 86.

## II.    Factual Background

The District, an Arizona municipal corporation created in 1951, provides domestic water, electrical power, flood control, and other community services to the Wellton and Mohawk Valleys in or about Yuma, Arizona.  The District was formed to operate the Wellton-Mohawk Division of the Gila Project, a federal water reclamation project.  Pursuant to contracts entered into with the Secretary of the Interior, the District is responsible for operation, maintenance, and repair of irrigation and drainage works and facilities, including 378 miles of canals, laterals, and return flow channels.  Construction of the District's works and facilities involved a financial commitment by the District under a repayment contract with the United States.  The District has fully repaid the project construction costs relating to the works and facilities and was provided a certificate of discharge on November 27, 1991.

On July 10, 1998, the District and BOR entered into a Memorandum of Agreement ("MOA") governing the transfer of title of the works, facilities and lands of the Wellton-Mohawk Division to the District (the "Title Transfer").  Under the MOA, BOR agreed to transfer "the works and facilities of the [Wellton-Mohawk] Division, or portions thereof, constructed by the United States for the District" and associated land (including easements and rights-of-way). AR 59.  BOR also agreed to transfer certain "Withdrawn Lands," which are "those lands within and adjacent to the District that have been withdrawn from public use for

Reclamation purposes" and certain "Acquired Lands," which are "those lands within or adjacent to the [Wellton-Mohawk] Division acquired by the United States pursuant to Public Law 93-320 or Public Law 100-512." AR 57; AR 58-59. The MOA does not restrict future uses of the Withdrawn Lands and the Acquired Lands. Rather, the MOA provides that "[t]he District will ensure that the works, facilities, and lands to be transferred will be operated in accordance with authorized purposes. No change in project purpose, operation, or use is contemplated or intended by the District or the United States as a result of the transfer." AR 59.

In 2000, the Wellton-Mohawk Transfer Act was enacted, which provides:

> The Secretary of the Interior (Secretary) is authorized to carry out the terms of the Memorandum of Agreement No. 8-AA-34-WA014 (Agreement) dated July 10, 1998 between the Secretary and the Wellton-Mohawk Irrigation and Drainage District (District) providing for the transfer of works, facilities and lands to the District, including conveyances of Acquired Lands, Public Lands and Withdrawn Lands, as defined in the Agreement.

Pub. L. No. 106-221, § 2, 114 Stat. 351.

In connection with the Title Transfer, BOR was required to comply with certain federal laws, including NEPA and the NHPA. The District was required to pay the appraised fair market value for the Acquired Lands and the Withdrawn Lands. The District and BOR were jointly responsible for determining the land, works and facilities that would be transferred to the District. Other costs and expenses related to the Title Transfer were allocated between the parties, including a 50-50 cost share of all expenses associated with NEPA and NHPA compliance.

In August 2003, BOR circulated a draft environmental impact statement ("DEIS") on the Title Transfer for public comment. In the DEIS, the District identified 9,800 acres of land eligible to be transferred as candidate land for commercial and industrial development in accordance with Yuma County's existing development plan. The DEIS also contains multiple references to possible industrial development on the Transfer Lands. Plaintiff did not provide written or oral comments to BOR on the DEIS.

-4-

In November 2003, ACF announced plans to locate an oil refinery in Yuma County. ACF identified two potential sites for the refinery, with one on Transfer Lands and one on private land. ACF preferred the Transfer Lands site and designated it as the site for the refinery. ACF also transferred the Arizona Department of Environmental Quality ("ADEQ") air permit to the Transfer Lands site. ACF agreed to purchase the Transfer Lands site from the District and focused significant resources and attention to the site. While ACF has purchased the Transfer Lands site from the District, ACF has since decided to relocate the oil refinery project to lands that are not involved in the Title Transfer. *See* Doc. # 157.

To implement the NHPA process, BOR "[i]n consultation with the SHPO [Arizona State Historic Preservation Office] and Tribes, . . . designed and implemented a cultural resources program to determine the nature and extent of cultural resources on lands proposed for transfer, in accordance with 36 C.F.R. § 800.4." AR 6672. The program was conducted by an outside archaeological consulting firm, Statistical Research, Inc. ("SRI"). The first phase of the program involved a class I inventory (literature and archival search) of archaeological investigations in the lower Gila Valley. The original proposed action involved approximately 57,000 acres. SRI analyzed those 57,000 acres plus a 2.5 mile buffer around the perimeter of those lands.

The second phase of the program involved a class II/III inventory of approximately 5,900 acres of undisturbed land by pedestrian surveys. BOR and SRI focused the survey on undisturbed lands most likely to contain eligible sites. BOR determined that the majority of the Transfer Lands were unlikely to have intact cultural resources due to extensive prior usage and disturbance. SRI also conducted a geomorphic analysis of the project area. In February 2005, the District and BOR removed 2,124 acres of culturally sensitive lands from the Title Transfer. Based on the continued concerns of certain consulting tribes, BOR decided to inventory the remainder of undisturbed lands. SRI conducted a class III inventory of 4,833 acres of undisturbed lands in the Title Transfer.

As ultimately configured, the Title Transfer involves 47,538 acres containing 19

eligible properties (5 historic, 13 prehistoric and one mixed).  The Arizona State Historic Preservation Office ("ASHPO") concurred with BOR's eligibility determinations by letters dated November 28, 2005, and May 1, 2006.  Further, in a letter dated January 22, 2007, the Advisory Council on Historic Preservation ("ACHP") approved BOR's cultural resource investigation, and specifically determined "that BOR has made a reasonable and good faith effort to identify archaeological properties listed on or eligible for the national register.  A 100 percent survey of affected lands, locating all historic properties within the area of potential affects, is not a requirement of the ACHP's regulations."  AR 7156-58.  BOR determined that "the surveys conducted for this project constitute the most comprehensive cultural resource inventory conducted in this region to date."  AR 6670.  "Based on the overall survey results, approximately 92.5 percent of significant cultural resources were identified in the project area."  AR 6674.

During the NHPA process, BOR and the District consulted Plaintiff and other Indian Tribes concerning the identification of eligible sites.  Consultation with the various Indian Tribes began in 2003 and continued for approximately four years.  BOR conducted monthly tribal consultation meetings since July 2004 and made numerous concessions as a result of tribal concerns.  BOR conducted over thirty informational and government-to-government meetings with various Indian Tribes, including Plaintiff.  Despite those meetings, "the Quechan Tribe has not identified any specific TCPs or other eligible sites in the Title Transfer Area that Reclamation failed to investigate or consider."  AR 7408.

In December 2006, BOR issued its Final Environmental Impact Statement ("FEIS").  The FEIS contains an analysis of the potential environmental impacts resulting from the Title Transfer and of the cumulative impacts, including land resources and use, water resources, air quality, biological resources, cultural resources, transportation, visual resources, and noise.  The FEIS also evaluated two action alternatives, specifically a "No Action Alternative" providing that "facilities of the Wellton-Mohawk Division of the Gila Project and lands owned by Reclamation within or adjacent to the Gila Project would remain in federal ownership" and

a "Proposed Action/Preferred Alternative" providing that "Reclamation would transfer title to the facilities of the Division and lands within or adjacent to the Gila Project to the District." AR 6620-21.  In addition, the FEIS set forth action alternatives that were considered, but that were eliminated from analysis.  AR 6628-29.

Even though the location of the refinery was uncertain, and is now being relocated on lands that are not involved in the Title Transfer, BOR addressed the refinery in the FEIS, primarily in the discussion of cumulative effects.[3]  In the FEIS, BOR explained that the refinery project "anticipates a significant degree of federal, state, and local government interaction, coordination, and approval."  AR 6613.  BOR also identified federal and state permits required for construction of the refinery project, including a permit under the Clean Water Act, a Presidential Permit for the oil pipeline, consultation under the Endangered Species Act, an NHPA cultural resource analysis, and a NEPA review process to be completed by BLM and other federal agencies.  BOR determined that "construction of the refinery [cannot] occur until the NEPA review" is completed by BLM and other federal agencies. *Id*.; *see also* AR 6605.

On March 26, 2007, approximately three months after BOR's publication of the FEIS, BOR issued its Record of Decision ("ROD") selecting the "Proposed Action/Preferred Alternative" and providing that the Title Transfer would occur by quit claim deed in multiple conveyances.  On the same date, BOR transferred to the District approximately 39,000 acres of land.  Also on the same date, the District conveyed to ACF 1,460 acres of the transferred land for potential construction of an oil refinery.  BOR retained approximately 8,000 acres of land subject to the Title Transfer.  The lands transferred to the District do not contain any known cultural resources or eligible sites.  The 19 known eligible sites are on lands which

_____

[3]During the NEPA process in 2004-2005, the refinery was known to the participants in the process and other interested parties, including Plaintiff.  Plaintiff's representatives attended project meetings on September 29, 2004 and October 29, 2004, in which the BOR, Plaintiff and the District discussed the refinery and other possible land use projects, including industrial uses.

have not been transferred.

### III.   Standard of Review

The APA governs judicial review of agency decisions under NEPA and the NHPA. *Anderson v. Evans,* 371 F.3d 475, 486 (9th Cir. 2004).  In order to prevail on the merits of its claims, Plaintiff must demonstrate that BOR's actions were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 763 (2004). Under that standard, this Court applies a narrow and deferential standard of review:

> [I]n making the factual inquiry concerning whether an agency decision was "arbitrary or capricious," the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one."

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (citations omitted).

BOR's decision may be overturned only if the agency "committed a clear error in judgment." *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1114-15 (9th Cir. 2000), quoting *Northwest Envtl. Defense Ctr. v. Bonneville Power Admin*., 117 F.3d 1520, 1536 (9th Cir. 1997).  In applying the arbitrary and capricious standard, this Court is "not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).   Rather, the Court must affirm if BOR "'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'"  *Ranchers Cattleman Action Legal Fund United Stockgrowers of America v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007), *quoting City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004).   "This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its determination.'"  *Id.*, *quoting Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000).

-8-

Unlike summary judgment in an original district court proceeding, the function of the Court in a review of an administrative proceeding "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Engineering Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). *De novo* factfinding "is allowed only in limited circumstances." *Id.* (citations omitted). None of those circumstances are present here. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (stating that *de novo* review is authorized "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate" or "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action.").

## IV.   Discussion

While all parties have moved for summary judgment, the Court, by ruling on Plaintiff's motion, concludes that it is able to resolve Defendants' motions as well. Accordingly, the Court's Order will focus on Plaintiff's motion and the arguments contained therein.

### A.   Analysis of Action Alternatives in the Final Environmental Impact Statement

Plaintiff argues that BOR violated NEPA by failing to conduct a thorough analysis of action alternatives in its Final Environmental Impact Statement ("FEIS"). According to Plaintiff, BOR improperly considered only two alternatives in the FEIS: (1) the proposed action/preferred alternative of transferring all 47,626 acres of land to the District; and (2) the no action alternative of not transferring any land to the District. Plaintiff claims that BOR violated NEPA by failing to consider a third viable alternative: conveyance to the District of only those lands underlying the District's works and facilities. Plaintiff further claims that this alternative would allow approximately 19,300 acres of vacant and open space lands to remain protected in federal ownership and would reduce potential impacts to cultural and environmental resources.

The Court finds that Plaintiff waived its right to challenge BOR's choice of action alternatives when it failed to raise the third alternative during the NEPA process. As the

Supreme Court has stated, "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Department of Transportation v. Public Citizen*, 541 U.S. 752, 764 (2004), *quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553 (1978). The failure to challenge an agency's choice of action alternatives during the NEPA process results in a waiver of the right to subsequently challenge the agency's choice. *Id.* at 764-65. Until now, Plaintiff has not questioned the action alternatives considered by BOR. While Plaintiff defends its inaction by noting that a flaw "might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action," *Public Citizen*, 541 U.S. at 765, the Court finds that situation is not presented here. It is true, as Plaintiff points out, that a BOR employee and others suggested consideration of an action alternative similar to Plaintiff's third alternative, *see, e.g.,* AR 1870; however, as the record further provides, that action alternative was considered generic and a response or change was not expected. Thus, the Court concludes that the alleged flaw raised by Plaintiff was not so obvious to BOR that Plaintiff was not required to point it out specifically and, accordingly, the Court finds that Plaintiff has waived its right to challenge the sufficiency of BOR's action alternatives analysis.

Even assuming that Plaintiff's action alternatives argument has not been waived, the Court finds it lacks merit. As the Ninth Circuit has stated, "[j]udicial review of the range of alternatives considered by an agency is governed by a 'rule of reason' that requires an agency to set forth only those alternatives necessary to permit a 'reasoned choice.'" *State of California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (citations omitted). To this end, "an agency must look at every reasonable alternative, with the range dictated by the 'nature and scope of the proposed action.'" *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992) (citations omitted). "Alternatives that do not advance the purpose of the [project] will not be considered reasonable or appropriate." *Native Ecosystems Council v. U.S. Forest*

-10-

*Service*, 428 F.3d 1233, 1247 (9th Cir. 2005), *citing Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004).

In this case, the purpose of the proposed transfer of lands is to "divest Reclamation of the responsibility for the operation, maintenance, management, regulation of, and liability for the project facilities and appurtenant lands," and to transfer such responsibility "to an entity that has demonstrated its ability to best manage the project." AR 6601. The FEIS further explained that "[t]he transfer of title would consolidate management responsibility with the District, and thereby allow the District to have greater authority in the management of growth in the Wellton-Mohawk Valley, protect against encroachment on agriculture, and consolidate ownership of lands, facilities, and the Gila River Flood Channel." *Id*.

The action alternative Plaintiff proposes would not advance the stated purpose of the proposed transfer of lands. As the District notes, retaining over 19,000 acres of land in federal ownership would prevent the consolidation of ownership and management of various parcels of land scattered throughout the Wellton-Mohawk Irrigation and Drainage District, the very result the transfer of lands is intended to avoid. Accordingly, under *Block*, *Mumma*, and *Native Ecosystems*, BOR was not required to consider the action alternative Plaintiff proposes. Plaintiff's argument to the contrary lacks merit.

**B.     Analysis of Impacts of Proposed Oil Refinery in the Environmental Impact Statements**

Plaintiff advances three arguments in support of its claim that BOR failed to adequately analyze the effects of the proposed oil refinery. First, Plaintiff argues that the DEIS and the FEIS fail to analyze the potential impacts to environmental or cultural resources resulting from future industrial or heavy-industrial development, such as the ACF oil refinery proposal. Second, Plaintiff argues that BOR has a legal duty under NEPA to analyze the impacts of the proposed oil refinery. Finally, Plaintiff argues that BOR must analyze reasonably foreseeable environmental impacts associated with the proposed oil refinery. Because of the similarity of the three arguments supporting the one claim, the Court will address the arguments

simultaneously.[4]

BOR is required to take a "hard look" at the environmental consequences of its actions. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002) *citing Marsh*, 490 U.S. at 374.  "This includes considering all foreseeable direct and indirect impacts." *Id*. *citing City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975).  Direct impacts "are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  Indirect impacts "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*.

As the District argues in its motion for summary judgment, the key issue is whether the proposed oil refinery (or other development) is indirectly caused by the Title Transfer.[5]  The Supreme Court has limited the circumstances under which an action can be considered the indirect cause of an impact.  In *Public Citizen*, 541 U.S. 752 (2004), the Supreme Court stated that a "but for" causal relationship between an agency's action and an environmental effect "is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations . . . NEPA requires a 'reasonably close causal relationship' between the environmental effect and the alleged cause."  *Public Citizen*, 541 U.S. at 767, *citing Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983).   In *Metropolitan Edison*, the Supreme Court explained that "[s]ome effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation, will nonetheless not fall within [NEPA] because the causal chain is too attenuated."  460 U.S. at 774.  Particularly, "courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those

---

[4]Notably, the Court does not find that the facts presented at the preliminary injunction stage materially differ from the facts presented at this stage.  Accordingly, the Court relies heavily on the analysis set forth in its Findings of Fact and Conclusions of Law (Doc. # 85).

[5]The oil refinery cannot be considered a direct impact of the Title Transfer because it is not occurring at the same time and place as the Title Transfer.  40 C.F.R. § 1508.8(a).

1
2    that do not."  *Id*. at 774, n. 7.  In drawing such a "manageable line," the Supreme Court in
3    *Public Citizen* found that it was improper to consider an agency's action to be the cause of an

impact when the agency has limited authority to prevent the impact, stating:

> We hold that where an agency has no ability to prevent a certain
> effect due to its limited statutory authority over the *relevant*
> actions, the agency cannot be considered a legally relevant 'cause'
> of the effect.  Hence, under NEPA and the implementing CEQ
> regulations, the agency need not consider these effects in its EA
> when determining whether an action is a 'major federal action.'

7    *Id*. at 770 (italics added).

8         As *Public Citizen* instructs, the "relevant action" at issue herein is the locating and
9    constructing of the proposed refinery.  It is not the implementation of the Title Transfer.  This
10   is because, in *Public Citizen*, while the agency had authority to implement safety regulations
11   concerning Mexican motor carriers entering the United States, it did not need to consider the
12   environmental impact caused by the increased presence of Mexican motor carriers because the
13   President had the authority to modify the moratorium on the entry of Mexican motor carriers.
14   As such, the "relevant action" referenced in *Public Citizen* is not the agency's implementation
15   of the safety regulations, but instead is the President's modification of the moratorium.  Thus,
16   *Public Citizen* clearly concludes that the agency, which had no ability to prevent the
17   environmental effects in light of its limited authority over the President's modification of the
18   moratorium, had no duty to consider the environmental impact of increased presence of
19   Mexican motor carriers.

20        In this case, the Transfer Lands are not being transferred for the purpose of the
21   proposed refinery.  Under *Public Citizen*, BOR has no ability to prevent the environmental
22   effects of the proposed refinery because BOR has no authority over the existence, location or
23   construction of the refinery (the "relevant action").[6]  Therefore, despite recognizing that future

24   _____

25   [6]As the District also argues, ACF considered two potential sites for the oil refinery, one located
     on Transfer Lands and one located on private land in eastern Yuma County.  AR 6612.  Thus,
26   if the Title Transfer did not occur, ACF could proceed with construction of the refinery on the
     private land.

changes in land use on the Transfer Lands would not occur unless the Title Transfer is implemented, BOR had no duty to consider the environmental impact of the proposed refinery. BOR clearly recognized this limitation on its obligations in the FEIS.  The Court finds that BOR reasonably determined that it "does not have any control over the location or siting of the proposed oil refinery in implementing the Title Transfer with the District, and there is no causal connection between the Title Transfer and a third party proposal to locate an oil refinery in the Wellton-Mohawk Valley."  AR 7406.  BOR also reasonably determined that the Title Transfer and the refinery project are not "connected actions" under 40 C.F.R. § 1508.25.  The record is clear that (i) the Title Transfer does not automatically trigger the refinery project, (ii) the refinery project may proceed on private land with or without the Title Transfer and (iii) the Title Transfer and refinery are not interdependent parts of a larger action.

The Court also concludes that BOR did not need to consider the refinery in its NEPA process because the refinery is subject to a separate NEPA process.  The NEPA process has two purposes.  First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."  *Robertson,* 490 U.S. at 349.  Second, it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Id.*

Requiring BOR to consider the effects of a refinery that will be subject to its own detailed NEPA process fulfills neither purpose.  Since BOR has no ability to prevent the construction of the refinery or to even determine its impacts, the refinery's environmental impact would have no effect on BOR's decisionmaking regarding the land transfer.  As discussed, at least four other federal agencies must approve the refinery prior to its construction.  Each will require detailed information regarding the environmental impacts of the refinery.  Such information will be assembled in the separate NEPA process conducted for the refinery.  Plaintiff's concerns outlined in the Complaint can be raised and addressed in this separate NEPA process.

-14-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Similarly, the Court finds that NEPA's informational purpose would not be served by requiring BOR to consider the impacts of the refinery.  The "informational role" of an EIS is to "giv[e] the public the assurance that the agency 'has indeed considered environmental concerns in its decisionmaking process,' and, perhaps more significantly, provides a springboard for public comment" in the agency decisionmaking process itself.  *Robertson*, 490 U.S. at 349 (citations omitted).  Here, the public can have no effect on BOR's decisionmaking regarding the land transfer since BOR has no ability to prevent the construction of the refinery.  Instead, the public will have ample opportunity to participate in the NEPA process for the refinery.  The public may submit comments regarding the refinery, participate in public meetings, and, if appropriate, obtain judicial review of the agency's determination.  NEPA's second purpose is guaranteed to be fulfilled in the NEPA process for the refinery.

Further, the Court notes that ACF recently filed a notice in which it represents that the refinery project is being relocated to lands that are not involved in the Title Transfer.  This fact provides additional support for the Court's conclusion that the proposed refinery is not an indirect impact of the Title Transfer.[7]

### C.    Supplementation of DEIS to Analyze the Proposed Oil Refinery

Plaintiff argues that BOR violated NEPA by failing to supplement its DEIS upon learning that the District's transferee, ACF, intended to construct an oil refinery on specific Transfer Lands.  Federal regulations require supplementation when either: "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental

---

[7]This discussion also disposes of Plaintiff's arguments that BOR failed to take a "hard look" at the consequences of the proposed oil refinery or other possible impacts of future industrial development on the Transfer Lands.  In addition, a "manageable line," as discussed in *Metropolitan Edison*, cannot mean that BOR must analyze every possible and/or conceivable industrial development of the Transfer Lands.  Such an exercise would be extremely burdensome and likely would ultimately prove futile in light of the uncertainty surrounding the potential industrial development of the Transfer Lands.

concerns and bearing on the proposed action or its impacts." 40 C.F.R. 1502.9(c)(i) and (ii).

In *Marsh*, the United States Supreme Court concluded that agencies should apply a "rule of reason" to the decision to prepare a supplemental EIS. 490 U.S. at 373. The Court further concluded that a supplemental EIS is not required every time new information or circumstances come to light, as agencies would always be waiting and supplementing. *Id.* Rather, the Court held:

> Application of the "rule of reason" thus turns on the value of the new information to the still pending decisionmaking process . . . . If there remains "major federal action" to occur, and if the new information is sufficient to show that the remaining action will "affect the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplement . . . [impact statement] must be prepared.

*Id.* at 374.

In the DEIS, BOR identified 9,800 acres of Transfer Lands for commercial and industrial development in accordance with Yuma County's existing development plan. AR 2722-24. The DEIS contains multiple references to possible "industrial" development. *See* AR 2544-50, 2573. Thus, the Transfer Lands were identified as lands available for development in accordance with the 2010 Yuma County Comprehensive Plan, which specifically references commercial and industrial development. BOR also held meetings attended by Plaintiff's representatives in 2004 during which the refinery project was discussed.

Further, BOR discussed the refinery in the FEIS and ROD. However, BOR recognized that the refinery was a separate project subject to its own intensive NEPA and permitting process. BOR also recognized that the refinery has no bearing on the Title Transfer because BOR has no control or authority over the refinery project or other future uses of the Transfer Lands.[8]  Accordingly, BOR's conclusion that a supplemental EIS was not necessary was properly based on a consideration of the relevant factors, was not arbitrary or capricious, and is fully consistent with the *Marsh* "rule of reason."

---

[8]ACF's representation that the refinery project is being relocated to lands that are not involved in the Title Transfer lends further support to BOR's decision to not issue a supplemental EIS.

### D.   Cumulative Impact Analysis

Plaintiff argues that the cumulative impact analysis in the FEIS is inadequate and conclusory and improperly defers consideration of environmental impacts.  "Cumulative impacts" are defined as the "impact on the environment that results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.  In *Public Citizen*, the Supreme Court held that the cumulative impact analysis requirement neither enlarges the scope of analysis under NEPA nor eliminates the requirement that the impact be causally related to the proposed action.  541 U.S. at 769-70.  Thus, the cumulative impacts analysis is subject to the same "rule of reason" that limits the scope of analysis to "the usefulness of any new potential information to [BOR's] decision-making process." *Id.* at 767.  As the District argues, Plaintiff's cumulative impact analysis claim, in contravention of *Public Citizen*, is premised on the erroneous belief that the Title Transfer caused the oil refinery project, which, in turn, will spur other industrial development in the area.

In this case, BOR was required to consider the cumulative impacts caused by the Title Transfer and was not required to consider other impacts caused by unrelated developments in the project area.  Consistent therewith, BOR provided a detailed discussion of cumulative impacts of the Title Transfer on other land and resources uses in the project area.  *See, e.g.,* AR 6635-6711.  Plaintiff's claim that BOR failed to adequately consider cumulative impacts, that it was required to consider under controlling law, is unsupportable.

Additionally, an agency is not required "to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions.  Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment." *Kleppe v. Sierra Club*, 427 U.S. 390, 420 n. 20 (1976).  The court in *National Wildlife Federation v. FERC*, 912 F.2d 1471, 1478 (D.C.Cir. 1990), further explained:

> *Kleppe* thus clearly establishes that an EIS need not delve into the

-17-

> possible effects of a hypothetical project, but need only focus on the impact of the particular proposal at issue and other pending or recently approved proposals that might be connected to or act cumulatively with the proposal at issue.

BOR recognized that the impact resulting from future development in the area is speculative and unrelated to the Title Transfer.  There are approximately 121,000 acres of private and state land available for development in the Wellton-Mohawk Valley.  AR 6637.  Because of this, BOR determined that the Title Transfer would not alter existing growth and development patterns, *see* AR 6643-45, and explained:

> Other land use decisions following the title transfer may occur. However, because these decisions are vague, speculative, and will depend on a number of future political, planning, zoning, and economic factors, they cannot be solely attributed to this federal title transfer action, but instead will result from the outcomes of these future, uncertain decisions and processes.

AR 6710.  Under these circumstances, the Court finds that BOR did not err in determining that the refinery and other possible developments were not reasonably foreseeable actions such that discussion thereof was required in the cumulative impact analysis.[9]

### E.    Identification of Affected Cultural Resources

Plaintiff argues that BOR, in violation of the NHPA, failed to make a reasonable and good faith effort to identify historic properties, including properties of cultural significance, which could be affected by a federal undertaking.  Based on the underlying record, the Court finds that BOR conducted a reasonable and good faith investigation of cultural resources in the Transfer Lands as required by 36 C.F.R. § 800.4(b)(1).

As the FEIS provides, the process to identify affected cultural resources took place over a period of years.  AR 6716-17.  To implement the NHPA process, BOR "[i]n consultation with the SHPO [Arizona State Historic Preservation Office] and Tribes, . . . designed and implemented a cultural resources program to determine the nature and extent of cultural resources on lands proposed for transfer, in accordance with 36 C.F.R. § 800.4."  AR 6672.

---

[9]Once again, ACF's decision to relocate the refinery project to lands that are not involved in the Title Transfer further supports this conclusion.

The program was conducted by an outside archaeological consulting firm, Statistical Research, Inc. ("SRI").  The first phase of the program involved a class I inventory (literature and archival search) of archaeological investigations in the lower Gila Valley.  The original proposed action involved approximately 57,000 acres.  SRI analyzed those 57,000 acres plus a 2.5 mile buffer around the perimeter of those lands.  *Id.*  Thereafter, every parcel of undisturbed land was subject to a pedestrian Class II or Class III survey.  AR 6674. Throughout the process, BOR attempted to obtain information on the location of special places and traditional cultural properties through telephone calls, meetings and on-site visits with members of local tribes.  AR 5596-5601.  In total, the process lasted over five years and cost more than two million dollars.  AR 5596-5601.

Neither the NHPA nor the ACHP regulations require BOR to conduct a complete survey of all 47,538 acres of Transfer Lands.  *See Wilson v. Block*, 708 F.2d 735, 754 (D.C. Cir. 1983) ("the [ACHP] regulations do not expressly require agencies in all cases completely to survey impact areas, and in fact recognize that the need for survey will vary from case to case."); *National Indian Youth Council v. Watt*, 664 F.2d 220, 228 (10th Cir. 1981) (upholding partial survey because "the argument that a complete survey must be made of 40,000 acres before mining begins on eight acres borders on the absurd").  In fact, in its January 22, 2007 letter, the ACHP approved BOR's surveys and expressly determined that the NHPA regulations do not require BOR to survey 100% of the Transfer Lands.  AR 7156-58.  As stated in the ROD, a federal agency is required to make a reasonable and good faith effort to identify archaeological properties eligible for the National Register.  And, as the ACHP concluded, BOR's identification effort was a reasonable and good faith effort that satisfied Section 106 requirements.  AR 7157.  Thus, the Court concludes that BOR has satisfied its obligations to make a reasonable and good faith effort to identify eligible sites in the Title

Transfer area.[10]

### F.    Transfer of Lands Prior to Completion of Section 106 Process

Plaintiff argues that because BOR has not executed a final memorandum of agreement (*see* AR 7160-72) with ACHP, BOR approved and commenced, in violation of the NHPA, an undertaking (the Title Transfer) prior to the conclusion of the Section 106 process.  Relatedly, Plaintiff argues that BOR unlawfully segmented the Title Transfer by transferring lands on which no eligible sites were found and retaining, until completion of the Section 106 process, those lands on which the 19 eligible sites were found.  Finally, Plaintiff argues that BOR failed to adequately explain why it rejected ACHP's comment that the segmentation was improper.

The Court is not persuaded that BOR's transfer of lands on which no eligible sites were found and retention, pending completion of the Section 106 process, of lands on which eligible sites were found constitute a violation of the NHPA.  While Plaintiff cites to statutory authority to support its argument that such segmentation of the "undertaking" is unlawful, the Court has reviewed the cited authority and finds it silent on the issue.  For example, 36 C.F.R. § 800.16(y) states that an "[u]ndertaking means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency . . . ."  Further, 16 U.S.C. § 470h-2(l) states that "[w]here a . . . memorandum of agreement has been executed with respect to an undertaking, such memorandum shall govern the undertaking and all of its parts."  To the Court, nothing contained in the cited authority supports Plaintiff's argument that the segmentation of an undertaking is improper.

Instead, the Court agrees with ACF that 16 U.S.C. § 470h-2(l) applies to undertakings "which [affect] any property included in or eligible for inclusion in the National Register."  Accordingly, the memorandum of agreement properly applies to the 19 identified eligible sites,

---

[10]As ACF argues, Plaintiff's entire argument requires the Court to examine discrete portions of the process, rather than the results of the entire process, to find that the effort to locate eligible sites was not reasonable and in good faith.  In this instance, the Court finds this dissection of the process to be improper.

which are located on land that has not been transferred.  The land that has been transferred does not contain any sites eligible for inclusion in the National Register and the memorandum of agreement has no impact on those lands.  Finally, the Court agrees with ACF that BOR was only required to consider ACHP's comment that the segmentation was improper.  *See* 36 C.F.R. § 800.7(c)(4)(i).  The Court finds that BOR did consider such comment in its decision-making process.  *See* Doc. # 131, Exhibit B; AR 6560-61; AR 7398; AR 7401-02.

### G.    Consultation with Plaintiff Throughout Section 106 Process

Plaintiff claims that BOR failed to comply with the ACHP regulations requiring ongoing and continuous consultation with affected Indian tribes during the Section 106 process.  In support of that claim, Plaintiff advances four arguments.

First, Plaintiff argues that BOR failed to consult in a manner sensitive to the concerns and needs of Plaintiff by failing to engage in government-to-government consultations with Plaintiff regarding cultural resources.  While Plaintiff states that BOR held information sessions open to the general public, Plaintiff complains that such procedures failed to recognize its reluctance to publicly discuss its significant cultural resources.  *See* 36 C.F.R. § 800.4(a)(4) (providing that an agency official shall gather information from any Indian tribe to assist in identifying religious and culturally significant properties, recognizing that an Indian tribe, because of confidentiality concerns, may be reluctant to divulge specific information).  Plaintiff represents that it and other tribes objected to this consultation procedure.

As ACF notes, the record cited by Plaintiff in support of its and other tribes' objections to the consultation procedure indicates that only the Fort Mohave Tribe and Cocopah Indian Tribe objected.  *See* AR 6172; AR 6177.  Further, Plaintiff did participate in several government-to-government consultations.  *See* AR 5687; AR 5716; AR 5487; AR 5932; AR 5998; and AR 6562.  While the consultations occurred later in the NHPA process, after various surveys were completed and recommendations made, the Court does not agree with Plaintiff's argument that such timing alone indicates a violation of the ACHP regulations, specifically 36 C.F.R. § 800.2(a)(4) or 36 C.F.R. § 800.2(c)(2)(ii)(C).  In fact, as the record indicates,

Plaintiff raised numerous questions and made recommendations and requests during the consultations, which BOR addressed and/or acted upon during the NHPA process. *See* AR 5716 (addressing Plaintiff's questions raised during consultation); AR 5998 (agreeing to additional Class III surveys at request of Plaintiff). Accordingly, the Court concludes that Plaintiff's claim that BOR failed to engage in ongoing and continuous consultation with affected Indian tribes during the Section 106 lacks merit.

Second, Plaintiff argues that BOR, prior to commencing its efforts to identify eligible historic properties, failed to "invite" Plaintiff to be a consulting party to assist BOR in identifying such properties. However, as noted by Plaintiff, BOR sent Plaintiff a letter, dated March 15, 2002, "to request input from the Quechan Tribe regarding the Project and its potential effects, if any, on Tribal resources and interests, including, but not limited to, sacred sites, traditional cultural properties, and traditional use areas within the Project area." AR 870. Further, as discussed above, Plaintiff did participate in the NHPA process by consulting with BOR to identify eligible historic properties. While 36 C.F.R. § 800.3(f)(2) does require BOR to invite Plaintiff to be a consulting party, the Court does not find that the regulation requires that the invitation be extended, as suggested by Plaintiff, in any specific manner. Instead, the Court concludes that the record as a whole shows that BOR did invite Plaintiff to consult on the identification of eligible historic properties in the Title Transfer area. Plaintiff's claim to the contrary lacks merit.

Third, Plaintiff argues that BOR failed to consult with it in developing the memorandum of agreement or appropriate mitigation measures. However, Plaintiff's own counsel acknowledged that BOR was providing Plaintiff the opportunity to comment on the draft memorandum of agreement. AR. 7564-65 (stating that "the Bureau is now providing a general opportunity for the public to comment on the Draft MOA"). Further, the memorandum of agreement acknowledges Plaintiff's consulting role, stating:

> Reclamation has consulted with the tribes about the National Register eligible properties remaining in the title transfer and has invited comments on the resolution of effects as related to this

undertaking.  Reclamation's agency official has invited the tribes to be concurring parties in the MOA.

AR 7161.  Accordingly, the Court concludes that Plaintiff was given the opportunity to consult and comment on the memorandum of agreement.  Plaintiff's argument to the contrary lacks merit.

Finally, Plaintiff argues that BOR arbitrarily failed to invite Plaintiff to sign the memorandum of agreement.  The regulations only require that the SHPO, BOR and the ACHP be signatories to the memorandum of agreement.  The regulations also state that "any party that assumes a responsibility under a memorandum of agreement" should be invited to sign the agreement.  36 C.F.R. § 800.6(c)(2)(iii).  Under that provision, the District was invited to sign "because the District is the designated recipient of the lands, facilities and easements transferred from federal ownership under the ACT and because the District has assumed a legal responsibility to help resolve adverse effects on eligible properties from the undertaking." AR 7161.  Plaintiff has no similar responsibilities and its invitation to sign is a matter of discretion vested in BOR.  *See* 36 C.F.R. 800.6(c)(2)(ii) (BOR "may invite an Indian tribe . . . that attaches religious and cultural significance to historic properties . . . to be a signatory").  Plaintiff has offered no evidence to support its contention that BOR, in exercising its discretion, arbitrarily failed to invite Plaintiff to sign the memorandum of agreement.  Accordingly, Plaintiff's argument lacks merit.

## H.    Area of Potential Effects

Plaintiff argues that BOR arbitrarily and unreasonably limited the Section 106 analysis to the lands proposed for transfer, instead of analyzing impacts to cultural resources within the entire Wellton-Mohawk project area.  As Plaintiff explains, when a federal undertaking will potentially affect historic and/or cultural resources, the first step in the Section 106 review process is to define "the area of potential effects."  The "area of potential effects" is "the geographic area within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist."  36 C.F.R. 800.16(d).

In this case, the original proposed Title Transfer involved approximately 57,000 acres. AR 6635. The original "area of potential effects" consisted of the 57,000 acres plus a 2.5 mile buffer around the perimeter of those lands. AR 6672. It was only after the process began that the "area of potential effects" was reduced in size to eliminate the approximately 10,000 acres removed from the Title Transfer. AR 5962. Based on this record, the Court concludes that Plaintiff's argument that BOR arbitrarily limited the Section 106 analysis to the lands proposed for transfer, instead of analyzing impacts to cultural resources within the entire Wellton-Mohawk project area, lacks merit.

### I.    Failure to Protect Sites as Archaeological Districts

Plaintiff argues that BOR identified the presence of numerous prehistoric sites scattered throughout the Transfer Lands and on other lands within the general project area, but failed to consider designating broad groups of sites as protected archaeological districts. Plaintiff explains that the establishment of an archaeological district is appropriate where the agency identifies a grouping of individual resources that are similar in character and location. However, Plaintiff has failed to offer any evidence, other than representing that tribes commented that designation of a district would be appropriate, to support its argument. Accordingly, Plaintiff's claim lacks merit.

### V.    Conclusion

By finding that all of Plaintiff's arguments in support of summary judgment lack merit, the Court, for the same reasons discussed above, concludes that Defendants' summary judgment motions, in which Defendants argue that BOR's NEPA and NHPA analyses were sufficient, are well-taken. Further, as argued in the District's motion for summary judgment and for the reasons stated above, the Court agrees that BOR did not improperly segment its environmental review. The Court also agrees that Plaintiff's claims that BOR violated the Wellton-Mohawk Transfer Act and the Administrative Procedures Act are frivolous. Therefore, the Court will grant Defendants' motions for summary judgment.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. # 128) is DENIED;

**IT IS FURTHER ORDERED** that Arizona Clean Fuels Yuma, LLC's and Glenn McGinnis' Motion for Summary Judgment (Doc. # 129) is GRANTED;

**IT IS FURTHER ORDERED** that Wellton-Mohawk Irrigation and Drainage District's Motion for Summary Judgment (Doc. # 130) is GRANTED;

**IT IS FURTHER ORDERED** that Federal Defendants' Motion for Summary Judgment (Doc. # 134) is GRANTED;

**IT IS FURTHER ORDERED** that Wellton-Mohawk Irrigation and Drainage District's Motion to Strike Portions of Plaintiff's Statement of Facts in Support of Motion for Summary Judgment (Doc. # 138) is DENIED as the facts complained of did not affect the Court's decision;

**IT IS FURTHER ORDERED** that Plaintiff's oral motion to strike Arizona Clean Fuels Yuma, LLC's and Glenn McGinnis' Notice to the Court of Material Information, made in open court on February 11, 2008, is DENIED;

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Defendants and against Plaintiff in accordance with this Order.

DATED this 15th day of February, 2008.

James A. Teilborg
United States District Judge